UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

BRETT CHAPMAN,

                          Plaintiff,

              v.

VMWARE, INC., NICOLE ANASENES,
ANTHONY BATES, MARIANNE BROWN,
MICHAEL BROWN, MICHAEL S. DELL,
KENNETH DENMAN, EGON DURBAN,
KAREN DYKSTRA, RAGHU RAGHURAM,
and PAUL SAGAN.

                          Defendants.

Case No. 22-cv-07735

**COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT
OF 1934**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Brett Chapman ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

<u>NATURE OF THE ACTION</u>

1.      This action is brought by Plaintiff against VMware, Inc. ("VMware" or the "Company") and the members of the Company's Board ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of public stockholders of VMware ("VMware Stockholders") to, *inter alia*, vote in favor of a series

of merger transactions ("Merger") pursuant to which VMware will be acquired by Broadcom Inc. ("Broadcom") for $61 billion in cash and stock ("Merger Consideration").

2.      On May 26, 2022, VMware announced that the Board had approved the sale of the Company to Broadcom for the Merger Consideration pursuant to a merger agreement ("Merger Agreement"). Under the terms of the Merger Agreement, VMware Stockholders can elect to receive $142.50 per common share in cash or 0.2520 share of Broadcom common stock for each common share of VMware they own. The shareholder election will be subject to proration, resulting in approximately 50% of VMware's shares being exchanged for cash, and 50% of VMware's share being exchanged for Broadcom common stock. Based on the closing price of Broadcom common stock on May 24, 2022, the Merger Consideration is worth approximately $137.30 per VMware share. Based on the number of shares of Broadcom common stock and VMware common stock outstanding as of July 13, 2022, upon completion of the Merger, former VMware stockholders will own approximately 12.6% of the outstanding shares of Broadcom common stock, and existing Broadcom stockholders will own approximately 87.4% of the outstanding shares of Broadcom common stock.

3.      On August 26, 2022, Defendants and Broadcom authorized the filing of a proxy statement/prospectus with the SEC constituting, *inter alia*, a proxy statement ("Proxy") for VMware under the Exchange Act.

4.      The Proxy contains material misrepresentations and omissions in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 ("Material Disclosure Violations"), with the aim of soliciting VMware Stockholders to vote for the Merger and certain related proposals, including an amendment ("Charter Amendment") to VMware's certificate of incorporation to eliminate the personal liability of VMware's officers for monetary damages for

breach of fiduciary duty as an officer, except to the extent such an exemption is prohibited under Delaware law. The Material Disclosure Violations include without limitation (i) failing to disclose that, under Treasury Regulation 1.355–7(b), a certain tax agreement entered into by VMware limited VMware's ability to engage with a subset of potential acquirers; (ii) failing to identify potential acquirers, if any, with whom VMware believed it could not credibly engage during the sales process because of such tax agreement; and (iii) failing to disclose whether there were any discussions between Broadcom and VMware's directors and officers concerning post-Merger employment with Broadcom.

5.      The Proxy advises that a special meeting of VMware Stockholders will be held to vote on the Merger, the Charter Amendment and other related proposals ("Stockholder Vote"). The Material Disclosure Violations must be cured in advance of the Stockholder Vote to enable VMware Stockholders to cast informed votes with respect to the Merger, Charter Amendment and related proposals. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until the Material Disclosure Violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by himself and similarly-situated investors as a result of the Material Disclosure Violations.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of

jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at \*5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at \*23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "VMW" on the NYSE, which is headquartered in this District, and the false and misleading Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

9.      Plaintiff is, and has been at all relevant times, a continuous stockholder of VMware common stock.

10.      Defendant VMware is a Delaware corporation with its principal executive offices

4

located at 3401 Hillview Avenue, Palo Alto, California 94304.

11.     Defendant Nicole Anasenes has served as a member of the Board since April 2022.

12.     Defendant Anthony Bates has served as a member of the Board since February 2016.

13.     Defendant Marianne Brown has served as a member of the Board since October 2019.

14.     Defendant Michael Brown has served as a member of the Board since April 2007.

15.     Defendant Michael S. Dell ("Dell") has served as Chairman of the Board since September 2016. Dell and affiliated entities are 40.2% shareholders of VMware.

16.     Defendant Kenneth Denman has served as a member of the Board since January 2021.

17.     Defendant Egon Durban ("Durban") has served as a member of the Board since September 2016. Durban is a principal of Silver Lake Technology Management, L.L.C. ("Silver Lake"), a 10% shareholder of VMware through affiliated funds.

18.     Defendant Karen Dykstra ("Dykstra") has served as a member of the Board since March 2016.

19.     Defendant Raghu Raghuram ("Raghuram") has served as a member of the Board and as the Company's Chief Executive Officer (CEO) since June 2021.

20.     Defendant Paul Sagan ("Sagan") has served as a member of the Board since April 2014.

21.     Defendants identified in paragraphs 11 to 20 are collectively referred to herein as the "Individual Defendants," and together with VMware, collectively, the "Defendants."

Case 1:22-cv-07735-PKC   Document 1   Filed 09/11/22   Page 6 of 19

**SUBSTANTIVE ALLEGATIONS**

**VMware's Business**

22.     VMware is a leading provider of services that enable companies to securely build and deploy cloud-based applications.

23.     VMware was incorporated in Delaware in 1998, and acquired by EMC Corporation ("EMC") in 2004.

24.     In August 2007, VMware conducted an initial public offering of its Class A common stock ("Class A Stock"), but remained majority-owned by EMC, the sole stockholder of its Class B common stock ("Class B Stock").

25.     In September 2016, Dell Technologies Inc. ("Dell Inc.") acquired EMC, and VMware became a majority-owned subsidiary of Dell Inc.

**The 2021 Spin-Off From Dell Inc.**

26.     On November 1, 2021, VMware completed a spin-off ("Spin-Off") from Dell Inc. and became a standalone company. Pursuant to the Spin-Off, Dell Inc. distributed its 81% equity ownership of VMware to Dell Inc.'s stockholders, including Defendant Michael Dell and affiliated entities, and entities affiliated with Silver Lake.

27.     Following the Spin-Off, as of May 3, 2022, Defendant Dell and affiliated entities beneficially owned 40.2% of VMware, and Silver Lake beneficially owned 10% of VMware.

**The Tax Agreement Executed in Connection With the Spin-Off**

28.     The Spin-Off was structured to qualify as tax-free for Dell Inc. shareholders for U.S. federal income tax purposes. To ensure tax-free treatment for the Spin-Off, VMware and Dell Inc. entered into a tax matters agreement ("Tax Agreement"), dated April 14, 2021, in connection with the Spin-Off. The Tax Agreement generally provides that VMware is responsible to

6

indemnify Dell Inc. for any taxes incurred by Dell Inc. (or any of its affiliates or shareholders) resulting from a failure of the Spin-Off to qualify as a tax-free transaction under Section 355 of the Internal Revenue Code ("Tax Code") if such failure is attributable to acquisitions of VMware stock or assets, issuances of stock by VMware, changes in ownership of VMware stock and certain other specified actions or omissions by VMware, occurring after the Spin-Off. In addition, the Tax Agreement prohibits VMware from taking certain actions (including sales of substantially all of the assets of VMware, mergers involving VMware and certain acquisitions of VMware stock) ("Post Spin-Off Transactions") during the two-year period following the Spin-Off, unless VMware provides Dell Inc. with an opinion of counsel or Internal Revenue Service ("IRS") private letter ruling confirming that the proposed Post Spin-Off Transaction will not cause the Spin-Off to fail to qualify as a tax-free transaction under Section 355 of the Tax Code.

29.     Under Treasury Regulation 1.355–7(b) (26 C.F.R. § 1.355-7(b)), a Post Spin-Off Transaction could—absent the applicability of certain safe-harbors—cause the Spin-Off to fail to qualify as a tax-free transaction (and trigger VMware's indemnification obligation under the Tax Agreement) if an entity that acquires VMware after the date of the Spin-Off had an agreement, understanding, arrangement, or substantial negotiations concerning an acquisition of VMware at some time during the two-year period preceding the date of the Spin-Off (i.e., November 1, 2021).

30.     Based on Treasury Regulation 1.355–7(b), the practical effect of the Tax Agreement was to prevent VMware from engaging credibly with any potential buyers that had entered into substantial negotiations with Dell Inc. concerning an acquisition of VMware within two-years prior to consummation of the Spinoff.

**Background to the Merger**

31.     The Proxy discloses that on May 6, 2022, Hock E. Tan ("Tan"), the CEO of

Broadcom advised Defendant Dell of Broadcom's interest in acquiring VMware.

32.     On May 13, 2022, after additional discussions between Mr. Tan and Defendant Durban and other Silver Lake executives, Broadcom sent a letter ("May 13 Letter") to the Board offering VMware Stockholders $142.50 per share of VMware common stock, in the form of either $142.50 in cash or 0.2422 shares of Broadcom common stock, at the election of each VMware stockholder and subject to proration so that the total transaction consideration would be 50% cash and 50% stock. The May 13 Letter also sought an opinion of counsel that the transaction proposed by Broadcom would not cause the Spin-Off to fail to qualify as a tax-free transaction under Section 355 of the Tax Code.

33.     On May 15, 2022, the Board established a committee ("Transaction Committee") comprised of Defendants Dell, Durban, Dykstra and Sagan with authority to, among other things, review, evaluate, consider, investigate, discuss, negotiate and determine the advisability of any potential strategic alternatives available to VMware, including a potential business combination with Broadcom.

34.     On May 21, 2022, after receipt of a counter-proposal from the Board, Broadcom increased the exchange ratio for the 50% stock consideration from 0.2422 shares of Broadcom common stock to 0.2520 shares of Broadcom common stock.

35.     On May 26, 2022, after further due diligence by Broadcom and further negotiations between the parties, VMware's financial advisors, J.P. Morgan and Goldman Sachs, provided fairness opinions ("Fairness Opinions") to the Board concluding that the Merger Consideration was fair to VMware Stockholders from a financial point of view. Thereafter, the Board approved the Merger Agreement and resolved to recommend that VMware Stockholders vote to approve the Merger.

36.     Before the opening of New York Stock Exchange normal trading hours on May 26, 2022, the parties executed the Merger Agreement, and VMware's counsel delivered the legal opinion required by the Tax Agreement for VMware to engage in the Merger. Promptly following execution of the Merger Agreement, VMware and Broadcom publicly announced the Merger.

37.     Later on May 26, 2022, in accordance with the go-shop provisions in the Merger Agreement, at the direction of the Board, representatives of J.P. Morgan and Goldman Sachs began contacting parties about their interest in participating in the go-shop process. During the go-shop period ("Go-Shop Period"), representatives of J.P. Morgan and Goldman Sachs contacted 10 potential strategic acquirors (including two parties that had previously expressed interest in a transaction with VMware, i.e., Party A and Party B). Of such contacted parties, two potential strategic acquirors executed acceptable confidentiality agreements. During the Go-Shop Period, VMware provided confidential information in response to due diligence inquiries made by these two potential strategic acquirors. At 11:59 p.m. Pacific time on July 5, 2022, the Go-Shop Period expired without any party submitting a proposal to acquire VMware.

**Receipt of Different Consideration by Officers and Directors**

38.     The Proxy acknowledges that certain of VMware's directors and executive officers may have interests in the Merger "that are different from or in addition to" the interests of public VMware Stockholders, and purports to identify those differing and additional interests.

39.     First, concerning potential post-Merger employment by Broadcom, the Proxy states:

> Any of VMware's executive officers who become officers or employees or who otherwise are retained to provide services to Broadcom or Broadcom Merger Subs may, prior to, on, or following the closing of the transactions, enter into new individualized compensation arrangements with Broadcom or Broadcom Merger Subs and may participate in cash or equity incentive or other benefit plans maintained by Broadcom or Broadcom Merger Subs. ***As of the date of this proxy***

*statement/prospectus, no new individualized compensation arrangements between VMware's executive officers and Broadcom or Broadcom Merger Subs have been established*.

40.     Second, the Proxy discloses that, under the Merger Agreement, one member of the VMware Board, to be mutually agreed upon by VMware and Broadcom, will be added to Broadcom's board of directors.

## The Proxy Contains Material Misrepresentations and Omissions

41.     Defendants disseminated a false and misleading Proxy to VMware Stockholders that misrepresents or omits material information that is necessary for VMware Stockholders to cast informed votes with respect to the Merger, the Charter Amendment, and related proposals.

### *Material Omissions Concerning the Tax Agreement*

42.     The Proxy discloses as a risk factor that the Merger could cause the Spin-Off to become a taxable transaction, which would trigger an obligation on VMware under the Tax Agreement to indemnify Dell Inc. for any taxes owed as a result of the Spin-Off. Based on this disclosure alone, however, reasonable VMware Stockholders would not realize that the Tax Agreement posed additional material considerations with respect to the sales process in which the Board engaged following receipt of Broadcom's proposed bid (including without limitation, the Go-Shop Period) that VMware Stockholders would consider important to know in determining how to vote with respect to the Merger, the Charter Amendment and related proposals. Thus, statements in the Proxy regarding the Tax Agreement are incomplete and therefore misleading.

43.     First, as noted above, under Treasury Regulation 1.355–7(b), the practical effect of the Tax Agreement was to prevent VMware from engaging credibly with any potential acquirers that had previously entered into substantial negotiations with Dell Inc. concerning an acquisition of VMware within two-years prior to consummation of the Spinoff (since engaging with such

potential acquirers could cause the Spin-Off to become a taxable transaction and trigger VMware's indemnification obligation under the Tax Agreement). The Proxy, however, fails to discuss this effect of the Tax Agreement, and thus fails to communicate to VMware Stockholders that the Tax Agreement limited VMware's ability to credibly engage with a subset of potential acquirers. In other words, the Proxy failed to disclose that the Tax Agreement limited the universe of potential acquirers with whom VMware could credibly engage to discuss and negotiate alternative transactions.

44.     Second, the Proxy fails to identify potential acquirers, if any, with whom VMware could not credibly engage because of the Tax Agreement, and thus whom VMware failed to contact in connection with the Go-Shop Period. For example, as a hypothetical, a Party C and a Party D may have engaged in substantial negotiations concerning an acquisition of VMware within two years prior to the Spin-Off, and thus VMware could not credibly engage with such parties during the Go-Shop Period, and as a result, would not have contacted such parties during the Go-Shop Period. If such parties exist, the Proxy should make VMware Stockholders aware of them.

45.     In sum, restrictions on the ability of other potential bidders to negotiate alternative transactions with a target company is material information that stockholders of the target would deem important to know in considering how to vote with respect to a proposed transaction. Here, the Proxy lists specific potentially negative factors that the Board considered in connection with recommending the Merger (including without limitation, VMware's potential indemnification obligation under the Tax Agreement), but fails to (i) disclose to VMware Stockholders that, under Treasury Regulation 1.355–7(b), the Tax Agreement limited VMware's ability to engage with a subset of potential acquirers, and (ii) identify potential acquirers, if any, with whom VMware believed it could not credibly engage because of the Tax Agreement. As such, to ensure that

VMware Stockholders are able to cast fully informed votes with respect to the Merger, the Charter Amendment and related proposals, the Proxy must (i) disclose to VMware Stockholders that, under Treasury Regulation 1.355–7(b), the Tax Agreement limited VMware's ability to engage with a subset of potential acquirers, and (ii) identify potential acquirers, if any, with whom VMware believed it could not credibly engage because of the Tax Agreement. *See Goldstein v. Denner*, No. CV 2020-1061-JTL, 2022 WL 1671006, at *24-25 (Del. Ch. May 26, 2022) (discussing materiality of disclosures required in light of tax agreement).

***Material Omissions Concerning Differing Interests of VMware's Directors and Officers***

46.     Discussions with directors and officers concerning post-merger employment and/or board seats before a deal closes are material to stockholders in deciding how to vote with respect to a merger since the prospect of post-merger employment and/or board seats represents an economic motivation that could lead a director or officer to negotiate a deal at a less than optimal price.

47.     Here, the Proxy concedes that post-Merger employment and board seats represent interests of VMware's directors and officers in the Merger different from or in addition to the interests of VMware Stockholders of which VMware Stockholders "should be aware." Yet, the Proxy omits material information that is necessary to render statements in the Proxy regarding post-Merger employment and board seats not misleading.

48.     First, as the Delaware Chancery Court has explained, there is a meaningful distinction between discussions concerning "employment terms," and *any* discussions concerning the *prospect* of post-Merger employment and equity participation. *See In re Mindbody, Inc*., No. CV 2019-0442-KSJM, 2020 WL 5870084, at *11 (Del. Ch. Oct. 2, 2020) (observing that the "Definitive Proxy stated that 'Vista and [Mindbody] had not engaged in ***any employment or***

*retention-related discussions* with regard to [Mindbody] management,' but the Supplemental Proxy stated more carefully that 'Vista and [Mindbody] *had not discussed the* <u>*terms*</u> *of post-closing employment or equity participation* for [Mindbody] management.").

49.     Here, as noted, the Proxy states that "as of the date of this proxy statement/prospectus, no new individualized compensation arrangements between VMware's executive officers and Broadcom or Broadcom Merger Subs *have been established*." The Proxy fails to disclose, however, whether there have been any *discussions* between Broadcom and VMware's officers concerning post-Merger employment. In particular, Defendant Raghuram was actively involved in negotiating the Merger, and therefore any discussions between Broadcom and Raghuram concerning the prospect of post-Merger employment would constitute material information that VMware Stockholders would consider important to know in deciding how to vote with respect to the Merger.

50.     Second, the Proxy discloses that "[p]ursuant to the merger agreement, one member of the VMware board of directors, to be mutually agreed by VMware and Broadcom, will be added to Broadcom's board of directors." The Proxy does not disclose, however, whether the Broadcom board seat will be given to one of the members of the Transaction Committee that was tasked with reviewing, evaluating, and negotiating the proposed Merger with Broadcom. The motivations and interests of directors actively involved in negotiating a deal (such as the prospect of a board seat) is a material consideration for stockholders asked to vote on a deal.

***The Fairness Opinions Are False and Misleading***

51.     The Fairness Opinions included in the Proxy improperly fail to disclose certain key inputs and assumptions underlying the analyses on which they were based, which renders them false and misleading. Without this information, as described below, VMware Stockholders are

unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Fairness Opinions in determining whether to vote for the Merger. This omitted information, if disclosed, would significantly alter the total mix of information.

52.     With respect to Goldman Sachs's *Discounted Cash Flow Analysis*, the Proxy fails to adequately disclose how Goldman Sachs determined that a discount rate range of 7.5% to 8.5% was appropriate. The explanation that the discount rate range reflects "estimates of VMware's weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Goldman Sachs used to derive that range.

53.     Likewise, with respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to adequately disclose how J.P. Morgan determined that a discount rate range of 7.5% to 8.5% was appropriate. The explanation that the discount rate range reflects an analysis of the "weighted average cost of capital of VMware" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that J.P. Morgan used to derive that range.

54.     If the discount rate ranges used by Goldman Sachs and J.P. Morgan are artificially high it would have depressed the value range generated for VMware's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). As such, VMware Stockholders are entitled to further disclosure concerning the inputs Goldman Sachs and J.P. Morgan used to derive their discount rate ranges. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them."). Such information is material since a discounted cash flow analysis is "arguably the most important valuation metric." *Laborers Loc. 235 Benefit Funds v. Starent Networks, Corp.*, No. CIV.A. 5002-CC, 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009).

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

55.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

56.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

57.     In violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, Defendants disseminated a Proxy that made false and misleading statements of material fact, and failed to disclose material facts necessary in order to make statements made in the Proxy, in light of the circumstances under which they were made, not misleading.

58.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein not misleading.

59.     Yet, as specified in paragraphs 41-54 above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts from the Proxy necessary to make statements therein— in light of

the circumstances under which they were made—not misleading, in order to induce VMware Stockholders to vote in favor of the Merger, the Charter Amendment and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

60.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable VMware Stockholder would consider them important in deciding whether to vote in favor of the Merger, the Charter Amendment and related proposals. In addition, a reasonable VMware Stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to VMware Stockholders.

61.     Because of the material misrepresentations and omissions in the Proxy specified above, Plaintiff and other VMware Stockholders are threatened with irreparable harm insofar as Plaintiff and other VMware Stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger, the Charter Amendment and related proposals if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

62.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

63.     The Individual Defendants acted as controlling persons of VMware within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of VMware, and participation in, and/or awareness of VMware's

operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of VMware with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

64.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.    Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that VMware Stockholders vote for the Merger, the Charter Amendment and related proposals. The Individual Defendants were thus directly involved in the making of the Proxy.

66.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

67.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

69.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict, and can Plaintiff and other VMware Stockholders cast fully informed votes with respect to the Merger, the Charter Amendment and related proposals.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to VMware Stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages;

C.     Directing Defendants to account to Plaintiff for all damages suffered as a result of their misconduct;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 11, 2022                    **WOHL & FRUCHTER LLP**


By:/s *Joshua E. Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*